In United States District Court, Southern District of Texas, McAllen Division

United States of America v. Carla Cantu Herrera    Case No. 7:12-cr-1036-02

## Carla Cantu Herrera's Last Memo to Get It Right at Sentencing

Though a defendant may assert the privilege against self-incrimination in response to questions from the judge at sentencing, *Mitchell v. United States*, 526 U.S. 314 (1999), defendant Carla Cantu Herrera (Carla Cantu) moves the court to carefully calculate the advisory Guidelines range and to then vary or depart therefrom and sentence below that range.  Before and after doing living with and doing the bidding of her mentally ill, drug addicted, husband, Marcelo Herrera, the master-mind of this fraud on the Government's Medicare and Medicaid systems, defendant Carla Cantu is a different person and there is no doubt that her criminal conduct would not be repeated.  Though this defendant waived her right to appeal, the reviewing courts do not stop the sentencing pendulum from swinging above or below the advisory Guidelines range where the sentence is otherwise reasonable.  *United States v. Anderson*, 224 Fed. Appx. 420; 2007 U.S. App. LEXIS 8435 (5th Cir. 2007) (court affirmed Judge Crane's sentence to eight days time served and imposition of a three-year term of supervised release, where the calculated advisory Guidelines range was 30-37 months).    This court's sentence must be reasonable.  This court must be guided by sentencing considerations set forth in 18 U.S.C. § 3553(a).  This court is concerned with defendant Carla Cantu's personal growth after Marcelo's

incarceration after being indicted in this case, the nature of her participation in this offense, and the importance of her job to her rehabilitation.  See 18 U.S. §§ 3553(a)(1), 3553(a)(2)(D).  The court has received many letters from members of the community and the family and friends of defendant Carla Cantu, but the content of those letters largely speak to the § 3553 factors.  The "nature and circumstances of the offense" reveal that defendant Carla Cantu was briefly "Marketing Director" and trained employees under guidance from husband Marcelo, how to provide meals and other benefits to medical personnel and how to push wheelchairs and gather patient and physician identity information.  Later defendant Carla Cantu took a number of patients' folders, studied them and learned of billings being paid by Medicare or Medicaid before either the physician had signed approving as necessary the wheelchairs, equipment or supplies billed for, or said billed for merchandise had been delivered to patients.  That "after the fact knowledge" is what defendant Carla Cantu admitted to knowing in her interview with the FBI agent(s).  The sentence must be supported by the totality of the relevant statutory factors, though the court need not methodically address each statutory factor specifically.   The history and characteristics of the defendant, who had reintegrated into her community and showed no signs of repeating her long since past criminal behavior dictated by boy friend, and later baby-daddy and finally husband Marcelo, also support leniency.  The district court must address the need to consider the seriousness of the offense and the

need to afford adequate deterrence. Given defendant Carla Cantu's roles in this years long fraud scheme, they favor leniency. The district court must also address the need to prevent unwarranted disparities. Since there are so many clear reasons for giving herein a non-Guidelines sentence, the district court must carefully articulate its reasons, which effectively warrant the resulting sentencing disparities among this scheme's convicted and non-indicted participants. The district court has good reason to believe that defendant Carla Cantu was reformed and posed little risk to repeat her offense. While defendant Carla Cantu certainly violated the letter of the law, the circumstances of her offense, and of her criminal history provide rational and legitimate reasons to sentence her below the Guideline range.

Domestic abuse is a recognized ground for upward departure for the perpetrator of the domestic abuse. *United States v. Brewster*, 137 F.3d 22 (1st Cir. 1997). When a court is to sentence a victim of domestic abuse, reason dictates that reviewing courts would not stop the sentencing pendulum from swinging below the advisory Guidelines range where the sentence is otherwise reasonable. Such is this case with defendant Carla Cantu. When considered in the aggregate and individually, the 3553 factors suggest leniency in conjunction with the effects of the serious domestic abuse inflicted upon defendant Carla Cantu and her resulting post-traumatic stress syndrome and "self-defense" need to be compliant to Marcelo's demands or pay for any "revolt" by suffering verbal abuse, physical violence, and the never-ending fear of Marcelo's

"offing" her, if she did him wrong in any way.

The question is whether as to this defendant Carla Cantu, probation as a punishment is sufficient to satisfy the sentencing factors of 18 U.S.C.S. § 3553(a)(2)(a).  Probation is an available sentencing option for a felony C offense like defendant Carla Cantu pleaded guilty to.  See *United States v. Casey*, 480 Fed. Appx. 811; 2012 U.S. App. LEXIS 9870; 2012 FED App. 0500N (6th Cir. 2012) ("For the reasons that follow, we affirm."  Rachel Casey pled guilty to one count of wire fraud, in violation of 18 U.S.C. § 1343, and was sentenced to six months of imprisonment. She now challenges the sentence as procedurally and substantively unreasonable.).

In short, the Supreme Court has found that the court may impose probation even if the advisory guidelines advise imprisonment quoting the trial court judge: "a sentence of imprisonment may work to promote not respect, but derision, of the law if the law is viewed as merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing." *Gall v. United States*, 552 U.S. 38, 128 S.Ct. 586, 169 L. Ed. 2d 445 (2007).

In *Gall*, 552 U.S. at 48-49, the Court held that the appellate court erred in reversing sentence of probation imposed after defendant pled guilty to conspiracy to distribute drugs; requiring proportional justifications and extraordinary circumstances for departure was not consistent with *Booker*. Due deference was not given to reasonable decision that was justified by 18 U.S.C.S. § 3553(a)'s factors.  The Court

said:

> "We recognize that custodial sentences are qualitatively more severe than probationary sentences of equivalent terms. Offenders on probation are nonetheless subject to several standard conditions that substantially restrict their liberty. See United States v. Knights, 534 U.S. 112, 119, 122 S.Ct. 587, 151 L.Ed.2d 497 (2001) ("Inherent in the very nature of probation is that probationers 'do not enjoy the absolute liberty to which every citizen is entitled' " (quoting Griffin v. Wisconsin,483 U.S. 868, 874, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987))).FN4  Probationers may not leave **596 the judicial district, move, or change jobs without notifying, and in some cases receiving permission from, their probation officer or the court. They must report regularly to their probation officer, permit unannounced visits to their homes, refrain from associating with any person convicted of a felony, and refrain from excessive drinking. USSG § 5B1.3. Most probationers are also subject to individual "special conditions" imposed by the court. Gall, for instance, may not patronize any establishment that derives more than 50% of its revenue from the sale of alcohol, and must submit to random drug tests as directed by his probation officer. App. 109.

> > FN4. See also Advisory Council of Judges of National Council on Crime and Delinquency, Guides for Sentencing 13-14 (1957) ("Probation is not granted out of a spirit of leniency .... As the Wickersham Commission said, probation is not merely 'letting an offender off easily' "); 1 N. Cohen, The Law of Probation and Parole @ 7:9 (2d ed. 1999) ("[T]he probation or parole conditions imposed on an individual can have a significant impact on both that person and society .... Often these conditions comprehensively regulate significant facets of their day-to-day lives .... They may become subject to frequent searches by government officials, as well as to mandatory counseling sessions with a caseworker or psychotherapist").

In *Pepper v. United States*, 131 S.Ct. 1229, 179 L.Ed.2d 196 (2011), the Court held that exclusion at resentencing of evidence of petitioner's postsentencing rehabilitation contravened 18 U.S.C.S. § 3661; such evidence could support a downward variance under 18 U.S.C.S. § 3553(a). 18 U.S.C.S. § 3742(g)(2), which

precluded consideration of postsentencing rehabilitation evidence, was invalid under the Sixth Amendment and Booker.

In *Koon v. United States*, 518 U.S. 81, 113, 116 S. Ct. 2035, 135 L. Ed. 2d 392 (1996), the Court held that the district court had the discretion to reduce petitioner's sentence because the Sentencing Guidelines allow for reduction of sentences after considering certain factors stated and not stated in the Sentencing Guidelines.  The *Koon* Court said:

II

The Sentencing Reform Act of 1984, as amended, 18 U.S.C. § 3551 et seq., 28 U.S.C. §§ 991-998, made far reaching changes in federal sentencing. Before the Act, sentencing judges enjoyed broad discretion in determining whether and how long an offender should be incarcerated. Mistretta v. United States, 488 U.S. 361, 363, 102 L. Ed. 2d 714, 109 S. Ct. 647 (1989). The discretion led to perceptions that "federal judges mete out an unjustifiably wide range of sentences to offenders with similar histories, convicted of similar crimes, committed under similar circumstances." [**2044] S. Rep. No. 98-225, p. 38 (1983). In response, Congress created the United States Sentencing Commission and charged it with developing a comprehensive set of sentencing guidelines, 28 U.S.C. § 994. The Commission promulgated the United States Sentencing Guidelines, which "specify an appropriate [sentencing range] for each class of convicted persons" based on various factors related to the offense and the offender. United States Sentencing Commission, Guidelines Manual ch. 1, pt. A, p. 1 (Nov. 1995) (1995 USSG). A district judge now must impose on a defendant a sentence falling within the range of the applicable Guideline, if the case is an ordinary one.

The Act did not eliminate all of the district court's discretion, however. Acknowledging the wisdom, even the necessity, of sentencing procedures that take into account individual circumstances, see 28 U.S.C. § 991(b)(1)(B), Congress allows district courts to depart from the applicable Guideline range if "the court finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the

Sentencing Commission in formulating the guidelines that should result in a sentence different from that described. " 18 U.S.C. § 3553(b). To determine whether a circumstance was adequately taken into consideration by the Commission, Congress instructed courts to "consider only the sentencing guidelines, policy [*93] statements, and official commentary of the Sentencing Commission." Ibid.

Turning our attention, as instructed, to the Guidelines Manual, we learn that the Commission did not adequately take into account cases that are, for one reason or another, "unusual." 1995 USSG ch. 1, pt. A, intro. comment. 4(b). The Introduction to the Guidelines explains:

   "The Commission intends the sentencing courts to treat each guideline as carving out a 'heartland,' a set of typical cases embodying the conduct that each guideline describes. When a court finds an atypical case, one to which a particular guideline linguistically applies [***410] but where conduct significantly differs from the norm, the court may consider whether a departure is warranted." Ibid.

The Commission lists certain factors that never can be bases for departure (race, sex, national origin, creed, religion, socioeconomic status, 1995 USSG § 5H1.10; lack of guidance as a youth, § 5H1.12; drug or alcohol dependence, § 5H1.4; and economic hardship, § 5K2.12), but then states that with the exception of those listed factors, it "does not intend to limit the kinds of factors, whether or not mentioned anywhere else in the guidelines, that could constitute grounds for departure in an unusual case." 1995 USSG ch. 1, pt. A, intro. comment. 4(b). The Commission gives two reasons for its approach:

   "First, it is difficult to prescribe a single set of guidelines that encompasses the vast range of human conduct potentially relevant to a sentencing decision. The Commission also recognizes that the initial set of guidelines need not do so. The Commission is a permanent body, empowered by law to write and rewrite guidelines, with progressive changes, over many years. By monitoring when courts depart from the guidelines and by analyzing their stated reasons for doing so and court decisions with references thereto, the Commission, over time, will [*94] be able to refine the guidelines to specify more precisely when departures should and should not be permitted.

   "Second, the Commission believes that despite the courts' legal freedom to depart from the guidelines, they will not do so very often. This is because the

guidelines, offense by offense, seek to take account of those factors that the Commission's data indicate made a significant difference in pre-guidelines sentencing practice." Ibid.

So the Act authorizes district courts to depart in cases that feature aggravating or mitigating circumstances of a kind or degree not adequately taken into consideration by the Commission. The Commission, in turn, says it has formulated each Guideline to apply to a heartland of typical cases. Atypical cases were not "adequately taken into consideration," and factors that may make a case atypical provide potential bases for departure. [**2045] Potential departure factors "cannot, by their very nature, be comprehensively listed and analyzed in advance," 1995 USSG § 5K2.0, of course. Faced with this reality, the Commission chose to prohibit consideration of only a few factors, and not otherwise to limit, as a categorical matter, the considerations that might bear upon the decision to depart.

Sentencing courts are not left adrift, however.  The Commission provides considerable guidance as to the factors that are apt or not apt to make a case atypical, by listing certain factors as either encouraged or discouraged bases for departure. Encouraged factors are those "the Commission has not been able to take into account fully in formulating the guidelines." § 5K2.0. Victim provocation, a factor relied upon by the District Court in this suit, is an example of an encouraged downward departure factor, § 5K2.10, whereas disruption of a governmental function is an example of an encouraged upward departure factor, § 5K2.7. Even an encouraged factor is not always an appropriate basis for departure,  [***411]  for on some occasions the applicable Guideline will have  [*95]  taken the encouraged factor into account. For instance, a departure for disruption of a governmental function "ordinarily would not be justified when the offense of conviction is an offense such as bribery or obstruction of justice; in such cases interference with a governmental function is inherent in the offense." Ibid. A court still may depart on the basis of such a factor but only if it "is present to a degree substantially in excess of that which ordinarily is involved in the offense." § 5K2.0.

Discouraged factors, by contrast, are those "not ordinarily relevant to the determination of whether a sentence should be outside the applicable guideline range." 1995 USSG ch. 5, pt. H, intro. comment. Examples include the defendant's family ties and responsibilities, 1995 USSG § 5H1.6, his or her education and vocational skills, § 5H1.2, and his or her military, civic, charitable, or public service record, § 5H1.11. The Commission does not view

discouraged factors "as necessarily inappropriate" bases for departure but says they should be relied upon only "in exceptional cases." 1995 USSG ch. 5, pt. H, intro. comment.

The Commission's treatment of departure factors led then-Chief Judge Breyer to explain that a sentencing court considering a departure should ask the following questions:

"1) What features of this case, potentially, take it outside the Guidelines' 'heartland' and make of it a special, or unusual, case?

"2) Has the Commission forbidden departures based on those features?

"3) If not, has the Commission encouraged departures based on those features?

"4) If not, has the Commission discouraged departures based on those features?" United States v. Rivera, 994 F.2d 942, 949 (CA1 1993).

We agree with this summary. If the special factor is a forbidden factor, the sentencing court cannot use it as a basis  [*96]  for departure. If the special factor is an encouraged factor, the court is authorized to depart if the applicable Guideline does not already take it into account. If the special factor is a discouraged factor, or an encouraged factor already taken into account by the applicable Guideline, the court should depart only if the factor is present to an exceptional degree or in some other way makes the case different from the ordinary case where the factor is present. Cf. ibid. If a factor is unmentioned in the Guidelines, the court must, after considering the "structure and theory of both relevant individual guidelines and the Guidelines taken as a whole, " ibid., decide whether it is sufficient to take the case out of the Guideline's heartland. The court must bear in mind the Commission's expectation that departures based on grounds not mentioned in the Guidelines will be "highly infrequent." 1995 USSG ch. 1, pt. A, p. 6.

Against this background, we consider the standard of review.

III

Before the Guidelines system, a federal criminal sentence within statutory limits was, for all practical purposes, not reviewable on appeal.  [***412]

[**2046] Dorszynski v. United States, 418 U.S. 424, 431, 41 L. Ed. 2d 855, 94 S. Ct. 3042 (1974) (reiterating "the general proposition that once it is determined that a sentence is within the limitations set forth in the statute under which it is imposed, appellate review is at an end"); United States v. Tucker, 404 U.S. 443, 447, 30 L. Ed. 2d 592, 92 S. Ct. 589 (1972) (same). The Act altered this scheme in favor of a limited appellate jurisdiction to review federal sentences. 18 U.S.C. § 3742. Among other things, it allows a defendant to appeal an upward departure and the Government to appeal a downward one. §§ 3742(a), (b).

That much is clear. Less clear is the standard of review on appeal. The Government advocates de novo review, saying that, like the Guidelines themselves, appellate review of sentencing, and in particular of departure decisions, was intended to reduce unjustified disparities in sentencing. In its [*97] view, de novo review of departure decisions is necessary "to protect against unwarranted disparities arising from the differing sentencing approaches of individual district judges." Brief for United States 12.

We agree that Congress was concerned about sentencing disparities, but we are just as convinced that Congress did not intend, by establishing limited appellate review, to vest in appellate courts wide-ranging authority over district court sentencing decisions. Indeed, the text of § 3742 manifests an intent that district courts retain much of their traditional sentencing discretion. Section 3742(e)(4), as enacted in 1984, provided "the court of appeals shall give due regard to the opportunity of the district court to judge the credibility of the witnesses, and shall accept the findings of fact of the district court unless they are clearly erroneous." In 1988, Congress amended the statute to impose the additional requirement that courts of appeals "give due deference to the district court's application of the guidelines to the facts." Examining § 3742 in Williams v. United States, 503 U.S. 193, 117 L. Ed. 2d 341, 112 S. Ct. 1112 (1992), we stated as follows:

"Although the Act established a limited appellate review of sentencing decisions, it did not alter a court of appeals' traditional deference to a district court's exercise of its sentencing discretion. . . . The development of the guideline sentencing regime has not changed our view that, except to the extent specifically directed by statute, 'it is not the role of an appellate court to substitute its judgment for that of the sentencing court as to the appropriateness of a particular sentence.'" Id., at 205 (quoting Solem v. Helm, 463 U.S. 277, 290, n. 16, 77 L. Ed. 2d 637, 103 S. Ct. 3001 (1983)).

See also S. Rep. No. 225, at 150 ("The sentencing provisions of the reported bill are designed to preserve the concept that the discretion of a sentencing judge has a proper place in sentencing and should not be displaced by the discretion of an appellate court").

[*98] That the district court retains much of its traditional discretion does not mean appellate review is an empty exercise.    Congress directed courts of appeals to "give due deference to the district court's application of the guidelines to the facts." 18 U.S.C. § 3742(e)(4). The deference that is [***413] due depends on the nature of the question presented. The district court may be owed no deference, for instance, when the claim on appeal is that it made some sort of mathematical error in applying the Guidelines; under these circumstances, the appellate court will be in as good a position to consider the question as the district court was in the first instance.

A district court's decision to depart from the Guidelines, by contrast, will in most cases be due substantial deference, for it embodies the traditional exercise of discretion by a sentencing court. See Mistretta, 488 U.S. at 367 (noting that although the Act makes the Guidelines binding on sentencing courts, "it preserves for the judge the discretion to depart from the guideline applicable to a particular case"). Before a departure is permitted, certain aspects of the case must be found unusual enough for it to fall outside the heartland of cases in the Guideline. To resolve this question, the district court must make a refined assessment of the many facts bearing on the outcome, informed by its vantage point and  [**2047]  day-to-day experience in criminal sentencing. Whether a given factor is present to a degree not adequately considered by the Commission, or whether a discouraged factor nonetheless justifies departure because it is present in some unusual or exceptional way, are matters determined in large part by comparison with the facts of other Guidelines cases. District courts have an institutional advantage over appellate courts in making these sorts of determinations, especially as they see so many more Guidelines cases than appellate courts do. In 1994, for example, 93.9% of Guidelines cases were not appealed. Letter from Pamela G. Montgomery, Deputy General Counsel, United States Sentencing [*99] Commission (Mar. 29, 1996). "To ignore the district court's special competence -- about the 'ordinariness' or 'unusualness' of a particular case -- would risk depriving the Sentencing Commission of an important source of information, namely, the reactions of the trial judge to the fact-specific circumstances of the case. . . ." Rivera, 994 F.2d, at 951.

Considerations like these persuaded us to adopt the abuse-of-discretion standard in Cooter & Gell v. Hartmarx Corp., 496 U.S. 384, 110 L. Ed. 2d 359, 110 S. Ct. 2447 (1990), which involved review of a district court's imposition of Rule 11 sanctions, and in Pierce v. Underwood, 487 U.S. 552, 101 L. Ed. 2d 490, 108 S. Ct. 2541 (1988), which involved review of a district court's determination under the Equal Access to Justice Act, 28 U.S.C. § 2412(d), that the position of the United States was "substantially justified," thereby precluding an award of attorney's fees against the Government. There, as here, we noted that deference was owed to the "'judicial actor . . . better positioned than another to decide the issue in question.'" Pierce, supra, at 559-560 (quoting Miller v. Fenton, 474 U.S. 104, 114, 88 L. Ed. 2d 405, 106 S. Ct. 445 (1985); Cooter & Gell, supra, at 403. Furthermore, we adopted deferential review to afford "the district court the necessary flexibility to resolve questions involving 'multifarious, fleeting, special, narrow facts that utterly resist generalization.'" 496 U.S. at 404 (quoting [***414] Pierce, supra, at 561-562). Like the questions involved in those cases, a district court's departure decision involves "the consideration of unique factors that are 'little susceptible . . . of useful generalization,'" 496 U.S. at 404, and as a consequence, de novo review is "unlikely to establish clear guidelines for lower courts," id., at 405.

The Government seeks to avoid the factual nature of the departure inquiry by describing it at a higher level of generality linked closely to questions of law. The relevant question, however, is not, as the Government says, "whether a particular factor is within the 'heartland'" as a general proposition, Brief for United States 28, but whether the particular [*100] factor is within the heartland given all the facts of the case. For example, it does not advance the analysis much to determine that a victim's misconduct might justify a departure in some aggravated assault cases. What the district court must determine is whether the misconduct that occurred in the particular instance suffices to make the case atypical. The answer is apt to vary depending on, for instance, the severity of the misconduct, its timing, and the disruption it causes. These considerations are factual matters.

This does not mean that district courts do not confront questions of law in deciding whether to depart. In the present suit, for example, the Government argues that the District Court relied on factors that may not be considered in any case. The Government is quite correct that whether a factor is a permissible basis for departure under any circumstances is a question of law, and the court of appeals need not defer to the district court's resolution of the point. Little turns, however, on whether we label review of this particular question abuse

of discretion or de novo, for an abuse-of-discretion standard does not mean a mistake of law is beyond appellate correction. Cooter & Gell, supra, at 402. A district court by definition abuses its discretion when it makes an error of law. 496 U.S. at 405. That a departure decision, in an occasional case, may call for a legal determination does not mean, as a consequence, that parts of the [**2048] review must be labeled de novo while other parts are labeled an abuse of discretion. See id., at 403 (court of appeals should "apply a unitary abuse-of-discretion standard"). The abuse-of-discretion standard includes review to determine that the discretion was not guided by erroneous legal conclusions.

IV

The principles we have explained require us to reverse the rulings of the Court of Appeals in significant part.

 [*101]  A

The District Court departed downward five levels because King's "wrongful conduct contributed significantly to provoking the offense behavior." 833 F. Supp., at 786. Victim misconduct was an encouraged basis for departure under the 1992 Guidelines and is so now. 1992 USSG § 5K2.10; 1995 USSG § 5K2.10.

Most Guidelines prescribe punishment for a single discrete statutory [***415] offense or a few similar statutory offenses with rather predictable fact patterns. Petitioners were convicted of violating 18 U.S.C. § 242, however, a statute unusual for its application in so many varied circumstances. It prohibits, among other things, subjecting any person under color of law "to the deprivation of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States." A violation of § 242 can arise in a myriad of forms, and the Guideline applicable to the statute applies to any violation of § 242 regardless of the form it takes. 1992 USSG § 2H1.4. Section 2H1.4 takes account of the different kinds of conduct that might constitute a § 242 violation by instructing courts to use as a base offense level the greater of 10, or 6 plus the offense level applicable to any underlying offense. In this way, § 2H1.4 incorporates the base offense level of the underlying offense; as a consequence, the heartland of § 2H1.4 will vary depending on the defendant's conduct.

Here, the underlying offense was aggravated assault. After adjusting the

offense level for use of a dangerous weapon and bodily injury, see 1992 USSG § 1B1.5(a) (a Guideline that incorporates another Guideline incorporates as well the other's specific offense characteristics), the District Court added six levels as required by § 2H1.4. Section 2H1.4 adds the six levels to account for the fact that the offense was committed "under actual or purported legal authority," commentary to § 2H1.4, and that "the harm involved both the underlying conduct and activity intended [*102] to deprive a person of his civil rights," ibid. (incorporating introductory commentary to § 2H1.1).

The District Court's analysis of this departure factor showed a correct understanding in applying § 2H1.4 as a mechanical matter and in interpreting its heartland. After summarizing King's misconduct -- his driving while intoxicated, fleeing from the police, refusing to obey the officers' commands, attempting to escape from police custody, etc. -- the District Court concluded that a downward departure pursuant to § 5K2.10 was justified:

   "Mr. King's provocative behavior eventually subsided. The Court recognizes that by the time the defendants' conduct crossed the line to unlawfulness, Mr. King was no longer resisting arrest. He posed no objective threat, and the defendants had no reasonable perception of danger. Nevertheless, the incident would not have escalated to this point, indeed it would not have occurred at all, but for Mr. King's initial misconduct." 833 F. Supp., at 787.

The court placed these facts within the context of the relevant Guideline range:

   "Messrs. Koon and Powell were convicted of conduct which began as a legal use of force against a resistant suspect and subsequently crossed the line to unlawfulness, all in a matter of seconds, during the course of a dynamic arrest situation. However, the convicted offenses fall under the same Guideline Sections that would apply to a jailor, correctional officer, police officer or other state agent who intentionally used a dangerous weapon to assault an inmate, without [***416] legitimate cause to initiate a use of force.

    "The two situations are clearly different. Police officers are always armed with 'dangerous [**2049] weapons' and may legitimately employ those weapons to administer reasonable force. Where an officer's initial use of force [*103] is provoked and lawful, the line between a legal arrest and an unlawful deprivation of civil rights within the aggravated assault Guideline is relatively thin. The stringent aggravated assault Guideline, along with its upward adjustments for use of a deadly weapon and bodily injury, contemplates a range

of offenses involving deliberate and unprovoked assaultive conduct. The Guidelines do not adequately account for the differences between such 'heartland' offenses and the case at hand." Ibid.

The Court of Appeals rejected this analysis. It interpreted the District Court to have found that King had been the but-for cause of the crime, not that he had provoked it. According to the Court of Appeals, the District Court "ultimately focused not on provocation itself but rather on the volatility of the incident, and the close proximity between, on the one hand, the victim's misconduct and the officers' concomitant lawful use of force, and, on the other hand, the appellants' unlawful use or authorization of the use of force." 34 F.3d, at 1459. The Court of Appeals thought these considerations did not justify departure for victim misconduct. It first quoted the test this Court formulated for excessive force cases under the Fourth Amendment:

"'The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments -- in circumstances that are tense, uncertain, and rapidly evolving -- about the amount of force that is necessary in a particular situation.'" Ibid. (quoting Graham v. Connor, 490 U.S. 386, 396-397, 104 L. Ed. 2d 443, 109 S. Ct. 1865 (1989)).

The Court of Appeals reasoned that "before a use of force can be found excessive, the Graham 'calculus,' embracing the very factor which the district court found to be unusual in this case -- the 'dynamic arrest situation' -- has been taken into consideration." 34 F.3d, at 1459. Indeed, it noted the [*104] jury not only had to take the Graham factors into account, but also, to establish criminal liability, had to conclude that the petitioners "willfully came down on the wrong side of the Graham standard." 34 F.3d, at 1459 (emphasis in original). The Court of Appeals concluded that "the feature which the district court found unusual, and exculpatory, is built into the most fundamental structure of excessive force jurisprudence, and in criminal cases is built in twice." Ibid.

The court misinterpreted both the District Court's opinion and the heartland of the applicable Guideline range. The District Court's observation that the incident would not have occurred at all "but for" King's misconduct does not alter the further ruling that King provoked petitioners' illegal use of force. At the outset of its analysis, the District Court stated: "The Court finds, and

considers as a mitigating circumstance, that Mr. King's wrongful conduct contributed significantly to provoking the offense behavior." 833 F. Supp., at 786. It later discussed "Mr. King's wrongdoing and the [***417] substantial role it played in bringing about the defendants' unlawful conduct." Id., at 787. Indeed, a finding that King's misconduct provoked lawful force but not the unlawful force that followed without interruption would be a startling interpretation and contrary to ordinary understandings of provocation. A response need not immediately follow an action in order to be provoked by it. The Commission recognized this when it noted that although victim misconduct would rarely be a basis for departure in a nonviolent offense, "an extended course of provocation and harassment might lead a defendant to steal or destroy property in retaliation." 1992 USSG § 5K2.10. Furthermore, even if an immediate response were required by § 5K2.10, it occurred here: The excessive force followed within seconds of King's misconduct.

The Court of Appeals misinterpreted the heartland of § 2H1.4 by concentrating on whether King's misconduct [*105] made this an unusual case of excessive force. If § 2H1.4 covered punishment only for excessive force cases, it might well be a close question whether victim misconduct of this kind would be sufficient to take the case out of the heartland. Section 2H1.4 is not so designed, however. It incorporates the Guideline for the underlying offense, here § 2A2.2 for aggravated [**2050] assault, and thus creates a Guideline range and a heartland for aggravated assault committed under color of law. As the District Court was correct to point out, the same Guideline range applies both to a Government official who assaults a citizen without provocation as well as instances like this where what begins as legitimate force becomes excessive. The District Court did not abuse its discretion in differentiating between the classes of cases, nor did it do so in concluding that unprovoked assaults constitute the relevant heartland. Victim misconduct is an encouraged ground for departure. A district court, without question, would have had discretion to conclude that victim misconduct could take an aggravated assault case outside the heartland of § 2A2.2. That petitioners' aggravated assaults were committed under color of law does not change the analysis. The Court of Appeals thought that it did because § 2H1.4 "explicitly enhances sentences for official misconduct beyond those for civilian misconduct." 34 F.3d, at 1460. The statement is a non sequitur. Section 2H1.4 imposes a six level increase regardless of whether the government official's aggravated assault is provoked or unprovoked. Aggravated assault committed under color of law always will be punished more severely than ordinary aggravated assault. The District Court did not compare civilian offenders with official offenders; it compared official

offenders who are provoked with official offenders who are not. That was the correct inquiry. The punishment prescribed by § 2A2.2 contemplates unprovoked assaults, and as a consequence, the District Court did not abuse its discretion in departing downward for King's misconduct in provoking the wrong.

[*106]  B

We turn now to the three-level departure. As an initial matter, the Government urges us to hold each of the factors relied upon by the District Court to be impermissible departure factors under all circumstances. A defendant's loss of career opportunities must always be an [***418] improper consideration, the Government argues, because "persons convicted of crimes suffer a wide range of consequences in addition to the sentence." Brief for United States 38. Susceptibility to prison abuse, continues the Government, likewise never should be considered because the "degree of vulnerability to assault is an entirely 'subjective' judgment, and the number of defendants who may qualify for that departure is 'virtually unlimited.'" Id., at 39 (quoting 34 F.3d, at 1455). And so on.

Those arguments, however persuasive as a matter of sentencing policy, should be directed to the Commission. Congress did not grant federal courts authority to decide what sorts of sentencing considerations are inappropriate in every circumstance. Rather, 18 U.S.C. § 3553(b) instructs a court that, in determining whether there exists an aggravating or mitigating circumstance of a kind or to a degree not adequately considered by the Commission, it should consider "only the sentencing guidelines, policy statements, and official commentary of the Sentencing Commission." The Guidelines, however, "place essentially no limit on the number of potential factors that may warrant a departure." Burns v. United States, 501 U.S. 129, 136-137, 115 L. Ed. 2d 123, 111 S. Ct. 2182 (1991). The Commission set forth factors courts may not consider under any circumstances but made clear that with those exceptions, it "does not intend to limit the kinds of factors, whether or not mentioned anywhere else in the guidelines, that could constitute grounds for departure in an unusual case." 1995 USSG ch. I, pt. A, intro. comment. 4(b). Thus, for the courts to conclude a factor must not be considered  [*107] under any circumstances would be to transgress the policy-making authority vested in the Commission.

An example is helpful. In United States v. Lara, 905 F.2d 599 (1990), the Court of Appeals for the Second Circuit upheld a District Court's downward

departure based on the defendant's "potential for victimization" in prison due to his diminutive size, immature appearance, and bisexual orientation. Id., at 601. In what appeared to be a response to Lara, the Commission amended 1989 USSG § 5H1.4, to make physical . . . appearance, including physique," a discouraged [**2051] factor. 1995 USSG App. C., Amend. 386 (effective Nov. 1, 1991). The Commission did not see fit, however, to prohibit consideration of physical appearance in all cases, nor did it address the broader category of susceptibility to abuse in prison. By urging us to hold susceptibility to abuse in prison to be an impermissible factor in all cases, the Government would have us reject the Commission's considered judgment in favor of our own.

The Government acknowledges as much but says its position is required by 18 U.S.C. § 3553(a)(2). The statute provides:

"The court, in determining the particular sentence to be imposed, shall consider –

. . . .

"(2) the need for the sentence imposed –

"(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;  [***419]

"(B) to afford adequate deterrence to criminal conduct;

"(C) to protect the public from further crimes of the defendant; and

" (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner."

[*108] Echoing the Court of Appeals, the Government interprets § 3553(a)(2) to direct courts to test potential departure factors against its broad sentencing goals and to reject, as a categorical matter, factors that are inconsistent with them. The Government and the Court of Appeals read too much into § 3553(a)(2). The statute requires a court to consider the listed goals in determining "the particular sentence to be imposed." The wording suggests that the goals should be considered in determining which sentence to choose from

a given Guideline range or from outside the range, if a departure is appropriate. The statute says nothing about requiring each potential departure factor to advance one of the specified goals. So long as the overall sentence is "sufficient, but not greater than necessary, to comply" with the above-listed goals, the statute is satisfied. § 3553(a).

Even if the text of the statute were ambiguous, we would reject the Government's interpretation. The Government's theory -- that § 3553(a)(2) directs courts to decide for themselves, by reference to the broad, open-ended goals of the provision, whether a given factor ever can be an appropriate sentencing consideration -- would impose widespread judicial control over sentencing policy. This in turn would nullify the Commission's treatment of particular departure factors and its determination that, with few exceptions, departure factors should not be ruled out on a categorical basis. The sparse text of § 3553(a)(2) cannot support this implausible result. Congress created the Commission to "establish sentencing policies and practices for the Federal criminal justice system," 28 U.S.C. § 991(b)(1), and Congress instructed the Commission, not the courts, to "review and revise" the Guidelines periodically, § 994(o). As a result, the Commission has assumed that its role is "over time [to] . . . refine the guidelines to specify more precisely when departures should and should not be permitted." 1992 USSG ch. I, pt. A, intro. comment. 4(b). Had Congress intended the courts to supervise the Commission's treatment of departure factors, we expect [*109] it would have said so in a clear way. It did not, and we will not assume this role.

We conclude, then, that a federal court's examination of whether a factor can ever be an appropriate basis for departure is limited to determining whether the Commission has proscribed, as a categorical matter, consideration of the factor. If the answer to the question is no -- as it will be most of the time -- the sentencing court must determine whether the factor, as occurring in the particular circumstances, takes the case outside the heartland of the applicable Guideline. We now turn to the four factors underlying the District Court's three-level departure.

1

The first question is whether the District Court abused its discretion in relying on the collateral employment consequences [**2052] petitioners would [***420] face as a result of their convictions. The District Court stated:

"Defendants Koon and Powell will be subjected to a multiplicity of adversarial proceedings. The LAPD Board of Rights will charge Koon and Powell with a felony conviction and, in a quasi-judicial proceeding, will strip them of their positions and tenure. Koon and Powell will be disqualified from other law enforcement careers. In combination, the additional proceedings, the loss of employment and tenure, prospective disqualification from the field of law enforcement, and the anguish and disgrace these deprivations entail, will constitute substantial punishment in addition to any court-imposed sentence. In short, because Koon and Powell are police officers, certain unique burdens flow from their convictions. " 833 F. Supp., at 789 (footnotes omitted).

The Court of Appeals rejected the District Court's analysis, noting among other things the "ease with which this factor  [*110]  can be used to justify departures that are based, either consciously or unconsciously, on the defendant's socioeconomic status, a factor that is never a permissible basis for review." 34 F.3d, at 1454. We agree with the Court of Appeals that a defendant's career may relate to his or her socioeconomic status, but the link is not so close as to justify categorical exclusion of the effect of conviction on a career. Although an impermissible factor need not be invoked by name to be rejected, socioeconomic status and job loss are not the semantic or practical equivalents of each other.

We nonetheless conclude that the District Court abused its discretion by considering petitioners' career loss because the factor, as it exists in these circumstances, cannot take the suit out of the heartland of 1992 USSG § 2H1.4. As noted above, 18 U.S.C. § 242 offenses may take a variety of forms, but they must involve willful violations of rights under color of law. Although cognizant of the deference owed to the District Court, we must conclude it is not unusual for a public official who is convicted of using his governmental authority to violate a person's rights to lose his or her job and to be barred from future work in that field. Indeed, many public employees are subject to termination and are prevented from obtaining future government employment following conviction of a serious crime, whether or not the crime relates to their employment. See Cal. Govt. Code Ann. § 19572(k) (West 1995) ("Conviction of a felony or conviction of a misdemeanor involving moral turpitude" constitutes cause for dismissal); § 18935(f) (State Personnel Board may refuse to declare eligible for state employment one who has "been convicted of a felony, or convicted of a misdemeanor involving moral turpitude"); Ky. Rev. Stat. Ann. 18A.146(2) (Michie 1992); 4 Pa. Code § 7.173

(1995). Public officials convicted of violating § 242 have done more than engage in serious criminal conduct; they have done so under color of the law they have sworn to uphold. It is to be expected that a government official would be subject [*111] to the career-related consequences petitioners faced after violating § 242, so we conclude these consequences were adequately considered by the Commission in formulating § 2H1.4.

[***421] 2

We further agree with the Court of Appeals that the low likelihood of petitioners' recidivism was not an appropriate basis for departure. Petitioners were first-time offenders and so were classified in criminal history category I. The District Court found that "within Criminal History Category I, the Guidelines do not adequately distinguish defendants who, for a variety of reasons, are particularly unlikely to commit crimes in the future. Here, the need to protect the public from the defendants' future criminal conduct is absent 'to a degree' not contemplated by the Guidelines." 833 F. Supp., at 790, n. 20. The District Court failed to account for the Commission's specific treatment of this issue, however. After explaining that a district court may depart upward from the highest criminal offense category, the Commission stated:

   "However, this provision is not symmetrical. The lower limit of the range for Criminal History Category I is set for a first offender with the lowest risk of recidivism. Therefore, a departure below the lower [**2053] limit of the guideline range for Criminal History Category I on the basis of the adequacy of criminal history cannot be appropriate." 1992 USSG § 4A1.3

The District Court abused its discretion by considering appellants' low likelihood of recidivism. The Commission took that factor into account in formulating the criminal history category.

3

The two remaining factors are susceptibility to abuse in prison and successive prosecutions. The District Court did not abuse its discretion in considering these factors. The [*112] Court of Appeals did not dispute, and neither do we, the District Court's finding that "the extraordinary notoriety and national media coverage of this case, coupled with the defendants' status as police officers, make Koon and Powell unusually susceptible to prison abuse," 833 F. Supp., at 785-786. Petitioners' crimes, however brutal, were by definition the same for

purposes of sentencing law as those of any other police officers convicted under 18 U.S.C. § 242 of using unreasonable force in arresting a suspect, sentenced under § 2H1.4, and receiving the upward adjustments petitioners received. Had the crimes been still more severe, petitioners would have been assigned a different base offense level or received additional upward adjustments. Yet, due in large part to the existence of the videotape and all the events that ensued, "widespread publicity and emotional outrage . . . have surrounded this case from the outset," 833 F. Supp., at 788, which led the District Court to find petitioners "particularly likely to be targets of abuse during their incarceration," ibid. The District Court's conclusion that this factor made the case unusual is just the sort of determination that must be accorded deference by the appellate courts.

As for petitioners' successive prosecutions, it is true that consideration of this factor could be incongruous with the dual responsibilities of citizenship in our federal system in some instances. Successive state and federal prosecutions do not violate the Double Jeopardy Clause. Heath v. Alabama, 474 U.S. 82, 88 L. Ed. 2d 387, 106 S. Ct. 433 (1985). Nonetheless, [***422] the District Court did not abuse its discretion in determining that a "federal conviction following a state acquittal based on the same underlying conduct . . . significantly burdened the defendants." 833 F. Supp., at 790. The state trial was lengthy, and the toll it took is not beyond the cognizance of the District Court.

[*113]  V

The goal of the Sentencing Guidelines is, of course, to reduce unjustified disparities and so reach toward the evenhandedness and neutrality that are the distinguishing marks of any principled system of justice. In this respect, the Guidelines provide uniformity, predictability, and a degree of detachment lacking in our earlier system. This, too, must be remembered, however. It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue. We do not understand it to have been the congressional purpose to withdraw all sentencing discretion from the United States District Judge. Discretion is reserved within the Sentencing Guidelines, and reflected by the standard of appellate review we adopt.

* * *

Court of Appeals identified the wrong standard of review. It erred as well in finding that victim misconduct did not justify the five-level departure and that susceptibility to prison abuse and the burdens of successive prosecutions could not be relied upon for the three-level departure. Those sentencing determinations were well within the sound discretion of the District Court. The District Court did abuse its discretion in relying on the other two factors forming the three-level departure: career loss and low recidivism risk. When a reviewing court concludes that a district court based a departure on both valid and invalid factors, a remand is required unless it determines the district court would have imposed the same [**2054] sentence absent reliance on the invalid factors. Williams, 503 U.S. at 203. As the District Court here stated that none of the four factors standing alone would justify the three-level departure, it is not evident that [*114] the court would have imposed the same sentence if it had relied only on susceptibility to abuse in prison and the hardship of successive prosecutions. The Court of Appeals should therefore remand the case to the District Court.

The judgment of the Court of Appeals is affirmed in part and reversed in part, and the cases are remanded for further proceedings consistent with this opinion.

It is so ordered.

CONCUR BY: STEVENS (In Part); SOUTER (In Part); BREYER (In Part)

DISSENT BY: STEVENS (In Part); SOUTER (In Part); BREYER (In Part)

DISSENT

JUSTICE STEVENS, concurring in part and dissenting in part.

In my opinion the District Court did not abuse its discretion when it relied on the unusual collateral employment consequences faced by these petitioners as a result of their convictions. I therefore except Part IV-B-1 from my otherwise complete [***423] endorsement of the Court's opinion. I also note that I do not understand the opinion to foreclose the District Court from basing a downward departure on an aggregation of factors each of which might in itself be insufficient to justify a departure.

JUSTICE SOUTER, with whom JUSTICE GINSBURG joins, concurring in part and dissenting in part.

I agree with the way today's opinion describes a district court's tasks in sentencing under the Guidelines, and the role of a court of appeals in reviewing sentences, but I part company from the Court in applying its standard on two specific points. I would affirm the Court of Appeals's rejection of the downward departures based on susceptibility to abuse in prison and on successive prosecution, for to do otherwise would be to attribute an element of irrationality to the Commission and to its "heartland" concept. Accordingly, I join the Court's opinion except Part IV-B-3.

As the majority notes, ante, at 106, "Congress did not grant federal courts authority to decide what sorts of sentencing considerations are inappropriate in every circumstance." In [*115] fact, Congress allowed district courts to depart from the Guidelines only if "the court finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described." 18 U.S.C. § 3553(b); see also ante, at 92-93. While discussing departures, the Commission quotes this language from § 3553(b), before stating that "when a court finds an atypical case, . . . the court may consider whether a departure is warranted." United States Sentencing Commission, Guidelines Manual ch. 1, pt. A, intro. comment. 4(b) (Nov. 1995) (1995 USSG). Thus, both Congress and the Commission envisioned that departures would require some unusual factual circumstance, but would be justified only if the factual difference "should" result in a different sentence. Departures, in other words, must be consistent with rational normative order.

As to the consideration of susceptibility to abuse in prison, the District Court departed downward because it believed that "the widespread publicity and emotional outrage which have surrounded this case from the outset, in addition to the [petitioners'] status as police officers, lead the Court to find that Koon and Powell are particularly likely to be targets of abuse during their incarceration." 833 F. Supp. 769, 788 (CD Cal. 1993). That is, the District Court concluded that petitioners would be subject to abuse not simply because they were former police officers, but in large part because of the degree of publicity and condemnation surrounding their crime. 1 But that reasoning overlooks the fact that the publicity stemmed from the remarkable brutality of petitioners' proven behavior, which it was their misfortune to have precisely

[*116] documented [**2055] on film. [***424] To allow a departure on this basis is to reason, in effect, that the more serious the crime, and the more widespread its consequent publicity and condemnation, the less one should be punished; the more egregious the act, the less culpable the offender. In the terminology of the Guidelines, such reasoning would take the heartland to be the domain of the less, not the more, deplorable of the acts that might come within the statute. This moral irrationality cannot be attributed to the heartland scheme, however, and rewarding the relatively severe offender could hardly have been in the contemplation of a Commission that discouraged downward departures for susceptibility to prison abuse even when the nonculpable reason is an unusual "physical . . . appearance, including physique." 1995 USSG § 5H1.4; see also ante, at 107; 1995 USSG ch. 1, pt. A, intro. comment. 3 (discussing the principle of "'just deserts,'" which the Commission describes as a concept under which "punishment should be scaled to the offender's culpability and the resulting harms"). 2

FOOTNOTES

1 Although it is not essential to my analysis, I note in passing that the unusual extent of outside publicity is probably irrelevant in the prison environment. Given any amount of outside publicity, prison inmates quickly learn about new arrivals, including former police officers, and the crimes of which they were convicted.

2 The requirement of normative order does not, of course, say anything one way or the other about considering exceptionally unusual physical appearance as a basis to anticipate abuse.

The Court of Appeals appreciated the significance of the requisite moral calculus when it wrote that "any public outrage was the direct result of [petitioners'] criminal acts. It is incongruous and inappropriate to reduce [petitioners'] sentences specifically because individuals in society have condemned their acts as criminal and an abuse of the trust that society placed in them." 34 F.3d 1416, 1456 (CA9 1994). The Court of Appeals should be affirmed on this point.

I believe that it was also an abuse of discretion for the District Court to depart downward because of the successive prosecutions. 3 In these cases, there were facial showings [*117] that the state court system had malfunctioned when the petitioners were acquitted (or, in the case of one charge, had received no

verdict), and without something more one cannot accept the District Court's conclusion that there was no demonstration that a "clear miscarriage of justice" caused the result in the state trial. 833 F. Supp., at 790. This is so simply because the federal prosecutors, in proving their cases, proved conduct constituting the crimes for which petitioners had been prosecuted unsuccessfully in the state court. See Powell v. Superior Court, 232 Cal. App. 3d 785, 789, 283 Cal. Rptr. 777, 779 (1991) (noting that petitioners were charged, inter alia, with assault by force likely to produce great bodily injury, Cal. Penal Code Ann. § 245(a)(1) (West 1988), and being an officer unnecessarily assaulting or beating any person in violation of § 149); § 149 ("Every public officer who, under color of authority, [***425] without lawful necessity, assaults or beats any person" commits an offense); § 245(a)(1) ("Every person who commits an assault upon the person of another . . . by any means of force likely to produce great bodily injury" commits an offense); ante, at 87-88 (observing that petitioners were tried in state court for assault with a deadly weapon and excessive use of force by a police officer and tried in federal court for willfully using or willfully allowing others to use unreasonable force in arresting King); 833 F. Supp., at 790 (stating that the "same underlying conduct" was involved in both cases). While such a facial showing resulting from the identity of factual predicates for the state and federal prosecutions might in some cases be overcome, (by demonstrating, say, that a crucial witness for [*118] the State was unavailable in the state trial through no one's fault), there was no evidence to overcome it here.

FOOTNOTES

3 It is true, factually, that successive federal prosecutions after state proceedings occur very rarely even in criminal civil rights prosecutions, U.S. Commission on Civil Rights, Who is Guarding the Guardians?, 112, 116 (Oct. 1981) (noting that between 50 and 100 police misconduct cases are brought each year and that from March 1977 to September 1980 only seven successive prosecutions were authorized); United States v. Davis, 906 F.2d 829, 832 (CA2 1990) ("In practice, successive prosecutions for the same conduct remain rarities"). Those figures do not, however, demonstrate that all convictions on successive federal prosecutions under 18 U.S.C. § 242 should for that reason be subject to discretion to depart downward, for they do not take account of the normative ordering, discussed below.

[**2056] As a consequence, reading the Guidelines to suggest that those who profit from state-court malfunctions should get the benefit of a downward

departure would again attribute a normative irrationality to the heartland concept. The sense of irrationality here is, to be sure, different from what was presupposed by the District Court's analysis on the issue of susceptibility to abuse in prison, for the incongruity produced by downward departures here need not depend on the defendant's responsibility for the particular malfunction of the state system. But the fact remains that it would be a normatively obtuse sentencing scheme that would reward a defendant whose federal prosecution is justified solely because he has obtained the advantage of injustice produced by the failure of the state system.

This is not, of course, to say that a succession of state and federal prosecutions may never justify a downward departure. If a comparison of state and federal verdicts in relation to their factual predicates indicates no incongruity, a downward departure at federal sentencing could well be consistent with an application of a rational heartland concept. But these are not such cases.

JUSTICE BREYER, with whom JUSTICE GINSBURG joins, concurring in part and dissenting in part.

I join the Court's opinion with the exception of Part IV-B-3. I agree with JUSTICE SOUTER's conclusion in respect to that section. The record here does not support departures based upon either the simple fact of two prosecutions or the risk of mistreatment in prison.

In my view, the relevant Guideline, 1992 USSG § 2H1.4, encompasses the possibility of a double prosecution. That Guideline applies to various civil rights statutes, which Congress enacted, in part, to provide a federal forum for the protection of constitutional rights where state law enforcement [*119] efforts had proved inadequate. See, e. g., Ngiraingas v. Sanchez, 495 U.S. 182, 187-189, 109 L. Ed. 2d 163, 110 S. Ct. 1737 (1990); Monroe v. Pape, 365 U.S. 167, 171-180, 5 L. Ed. 2d 492, 81 S. Ct. 473 (1961); Screws v. United States, 325 U.S. 91, 131-134, 89 L. Ed. 1495, 65 S. Ct. 1031 (1945) (Rutledge, J., concurring in result). Before promulgating the Guidelines, the Commission "examined the many hundreds of criminal statutes in the United States Code, " 1995 USSG ch.1, pt. A, [***426] intro. comment. 5, and it would likely have been aware of this well-known legislative purpose. The centrality of this purpose, the Commission's likely awareness of it, and other considerations that JUSTICE SOUTER mentions, ante, at 116-118, lead me to conclude on the basis of the statute and Guideline itself, 18 U.S.C. § 3553(b), that the Commission would have considered a "double prosecution" case as one

ordinarily within, not outside, the "civil rights" Guideline's "heartland." For that reason, a simple double prosecution, without more, does not support a departure. See § 3553(b) (departures permitted only when circumstances were "not adequately taken into consideration" by the Commission) (emphasis added).

The departure on the basis of potential mistreatment in prison presents a closer question. Nonetheless, differences in prison treatment are fairly common -- to the point where too frequent use of this factor as a basis for departure could undermine the uniformity that the Guidelines seek. For that reason, and others that JUSTICE SOUTER mentions, ante, at 115-116, I believe that the Guidelines themselves embody an awareness of potentially harsh (or lenient) treatment in prison, thereby permitting departure on that basis only in a truly unusual case. Even affording the District Court "due deference," § 3742(e), I cannot find in this record anything sufficiently unusual, compared, say, with other policemen imprisoned for civil rights violations, as to justify departure.

**Consult Certificate:** None.

**Service Certificate:** DCECF will send above to record counsel on October 17, 2013.

Respectfully submitted by this Defendant's lead attorney on October 17, 2013,

<div style="margin-left:40%;">

/s/ Joseph A. Connors III
Joseph A. Connors III
Texas Bar No. 04705400
S. Dist. Texas Bar No. 3799
P.O. Box 5838
McAllen, Texas  78502-5838
956-687-8217;   Fax   956-687-8230
connors@innocent.com

</div>